**TAGGED OPINION**



**ORDERED in the Southern District of Florida on February 27, 2007.**

_____
**A. Jay Cristol, Judge
United States Bankruptcy Court**

_____

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re:

PAN AMERICAN HOSPITAL
CORPORATION and PAN AMERICA
MEDICAL CENTERS, INC.,

Debtors.
_____/

Case Nos.04-11819-BKC-AJC
and 04-11820-BKC-AJC

Jointly Administered under Case
No. 04-11819-BKC-AJC

Chapter 11

**MEMORANDUM OPINION AND ORDER DENYING MARIA PINIERO'S
MOTION FOR RECONSIDERATION OF CLAIM**

This matter came before the Court upon the Motion for Reconsideration of Claim,

C.P. No. 2042 (the "Motion for Reconsideration" or "Motion"), filed by Maria Piniero as

personal representative of the estate of Florencio Pernas.  The Court held an initial

hearing on the Motion on December 5, 2006, at which the parties announced that they

had agreed to submit the matter to mediation and, therefore, requested a continuance of the hearing pending the outcome of mediation. A full-day mediation session was conducted on January 2, 2007, but no resolution was reached and the mediator filed a Report of Mediation Impasse on January 5, 2007 (C.P. No. 2177). Accordingly, the Court held a continued hearing on the Motion on February 14, 2007, at which respective counsel for Maria Piniero, Pan American Hospital Corporation ("PAHC") and the Official Committee of Unsecured Creditors for PAHC (the "Committee") presented arguments to the Court which had been fully briefed, and which briefs had been reviewed and considered by the Court, prior to the February 14 hearing. At the conclusion of the hearing, the parties stipulated to certain material facts and the Court announced its intention to rule on the Motion as a matter of law without the need for further discovery or an evidentiary hearing.

The Court has reviewed and considered the Motion, the written responses thereto filed by PAHC and the Committee (C.P. Nos. 2128 and 2126), Piniero's Memorandum of Law in Support of Piniero's Motion for Reconsideration of Claim (C.P. No. 2299), PAHC's Request for Admissions served upon Maria Piniero and Piniero's responses thereto (C.P. Nos. 2305 and 2210), and the relevant record in PAHC's bankruptcy case, including claim no. 220 filed by Maria Piniero as personal representative of the estate of Florencio Pernas. The Court has heard and considered the arguments and representations of counsel at the hearing and is otherwise fully advised. This Memorandum Opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

### General Background

PAHC and Pan American Medical Centers ("PAMC" and, together with PAHC, the "Debtors") each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on March 5, 2004 (the "Petition Date"). The Committee was appointed by the Office of the U.S. Trustee on December 1, 2004. PAHC filed a Chapter 11 plan of liquidation on December 28, 2006, C.P. No. 2166 (the "Plan"). A hearing on confirmation of the Plan is scheduled for March 1, 2007.

### Pre-Petition Relationship Between Florencio Pernas and PAHC

A detailed recitation of the alleged facts surrounding Mr. Pernas's pre-petition admission to Pan American Hospital and subsequent events leading to his death is contained in the Notice of Intent to Initiate Litigation for Medical Malpractice (the "Notice of Intent") sent by Maria Piniero's attorneys to PAHC's medical malpractice counsel on July 18, 2006, including the Verified Opinion of Medical Expert, Gregory Lee Hirsch, M.D. and narrative summary prepared by Henry Pernas (Mr. Pernas's son) attached thereto, and in the Complaint for Wrongful Death filed by Maria Piniero against PAHC in the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida on December 7, 2006 (the "State Court Complaint").[1]

---

[1] Copies of the State Court Complaint, Notice of Intent, expert opinion and narrative summary are attached as Exhibits A through D to the Request for Admissions served upon Ms. Piniero by PAHC on January 18, 2007, and filed with the Court as C.P. No. 2305 (the "Request for Admissions"). By her response to the Request for Admissions served January 26, 2007, and filed with the Court as C.P. No. 2210, Ms. Piniero admitted that the copies of the State Court Complaint and Notice of Intent attached to the Request for Admissions are true and correct copies of such documents. For purposes of this Memorandum Opinion, the Court accepts the facts alleged in the State Court Complaint, Notice of Intent, expert opinion and narrative summary as true and undisputed, without prejudice to the rights of PAHC, or any successor to PAHC under a plan or otherwise, to contest any of these allegations, including causation, in any proceeding involving the underlying merits of Ms. Piniero's wrongful death claim.

The relevant facts are summarized as follows. Mr. Florencio Pernas, a 76-year old man residing in Miami-Dade County, was admitted to the emergency room at Pan American Hospital on or about December 28, 2003, after experiencing symptoms of a cold and fever. After two or three days in the Hospital, Mr. Pernas's fever apparently subsided and he was moved to a regular hospital room. On December 31, 2003, Mr. Pernas, still suffering from a chest cold, began coughing and experienced difficulty breathing. The Hospital determined that Mr. Pernas was in respiratory arrest and needed intubation to clear his lungs. The claimant alleges that Mr. Pernas was not intubated until approximately one hour after the onset of his respiratory distress and, further, that the time lapse between the onset of his respiratory condition and his intubation resulted in a brain injury caused by oxygen deprivation that eventually left Mr. Pernas comatose and directly and proximately caused his death which occurred on April 30, 2004.

At the conclusion of the February 14, 2007 hearing on the Motion for Reconsideration, the parties stipulated to the following material facts, which the Court finds are the only material facts necessary to the Court's summary adjudication of the Motion: (i) Florencio Pernas was admitted to Pan Amercian Hospital pre-petition and the Hospital's alleged negligent treatment of Mr. Pernas (i.e., its failure to intubate) occurred pre-petition; (ii) the Hospital's alleged negligence was the direct and proximate cause of Mr. Pernas's death; and (iii) Mr. Pernas died post-petition on April 30, 2004.[2]

---

[2] At the February 14 hearing, no party objected to the Court's characterization of these facts as undisputed or the Court's stated intent or ability to rule on the Motion as a matter of law without the need for further discovery or an evidentiary hearing.

4

**Procedural History Regarding Piniero Claim**

On February 9, 2005, Maria Piniero, as personal representative of the estate of Florencio Pernas, filed a general unsecured claim against PAHC, designated claim no. 220, asserting wrongful death damages in the amount of $2 million (the "Piniero Claim").

PAHC objected to the Piniero Claim on several bases by way of a claim objection filed January 26, 2006 (C.P. No. 1282). Ms. Piniero filed a response to the objection (C.P. No. 1367) and an agreed order was entered (C.P. No. 1817) disallowing her claim as a pre-petition claim but allowing Ms. Piniero to file a post-petition claim which would be deemed timely filed. After learning new information about the pre-petition timing of the Hospital's alleged negligence that led to Mr. Pernas's death, by way of certain documentation produced to PAHC by the claimant, PAHC's counsel moved to vacate the agreed order by motion filed August 9, 2006. At the August 17, 2006 hearing on that motion, the Court ruled to vacate the order (*see* C.P. No. 1897) and instructed either of the parties to initiate a proceeding by which the pre-petition or post-petition status of the Piniero Claim, though not its underlying merits, could be determined by the Court.

Accordingly, Ms. Piniero filed the Motion for Reconsideration on November 6, 2006, seeking a determination that the Piniero Claim is a post-petition claim entitled to administrative priority treatment. The contested matter initiated by the Motion under Federal Rule of Bankruptcy Procedure 9014 involves the sole issue of whether the Piniero Claim is a pre-petition general unsecured claim or a post-petition administrative priority claim in PAHC's bankruptcy case.

**DISCUSSION**

I. **The Question of *When* a Claim Arises in Bankruptcy is an Issue of Bankruptcy Law under 11 U.S.C. § 101(5)**

The term "claim" is defined in section 101(5) of the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent*, matured, *unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5) (emphasis added). By enactment of section 101(5), Congress intended to define the term "claim" as broadly as possible to eliminate the provability requirement under the former Bankruptcy Act – by allowing contingent and unmatured liabilities of a debtor to be recognized and dealt with in the bankruptcy. *See* H.R. Rep. No. 95-595, at 309 (1978) ("By this broadest possible definition [of a 'claim'], . . . the bill contemplates that all legal obligations of the debtor, *no matter how remote or contingent*, will be able to be dealt with in the bankruptcy case.") (emphasis added); *In re Piper Aircraft Corp.*, 162 B.R. 619, 623 (Bankr. S.D. Fla. 1994) (Mark, J.) (discussing legislative intent behind section 101(5)).

Though an underlying claim may be a creature of state law, the existence of the claim in bankruptcy (and the question of when the claim arises) is an issue of bankruptcy law. *See, e.g., Watson v. Parker* (*In re Parker*), 264 B.R. 685, 697 (B.A.P. 10th Cir. 2001) (stating "[b]ecause the Bankruptcy Code expressly delineates the boundaries of the term 'claim,' the issue of whether a claim is valid under state law is not the primary inquiry for a bankruptcy court when determining whether a claim against a debtor is a bankruptcy claim under the Code[, and] [t]he central issue for a bankruptcy court is whether a claim as defined by the Bankruptcy Code existed pre-petition."). In deciding whether a claim

arose pre-petition or post-petition, the court's "focus should be on the time when the act giving rise to the claim was performed." *In re The Highland Group, Inc.,* 136 B.R. 475, 480-81 (Bankr. N.D. Ohio 1992) (noting "[t]he majority of courts … have held that a right to payment arises at the time of the Debtor's prepetition misconduct **as opposed to the manifestation of the injury itself**.") (emphasis added).

Numerous courts have interpreted section 101(5) to determine whether a particular claim came into existence pre-petition or post-petition; indeed, several theories have emerged in the caselaw to guide bankruptcy courts faced with this issue.

One early theory, adopted most notably by the Third Circuit Court of Appeals in a 1984 decision and upon which the movant relies in asserting that the Piniero Claim is a post-petition claim, is simply that no claim exists in bankruptcy until it has accrued and become actionable under state law. *Avellino & Bienes v. M. Frenville Co.*, 744 F.2d 332 (3rd Cir. 1984) ("*Frenville*"). *Frenville* involved a post-petition lawsuit commenced by a bank group against the debtor's former accountants for their negligent pre-petition preparation of the debtor's audited financial statements. 744 F.2d at 333. The accountants sought stay relief to implead the debtor as a third-party defendant under a state law indemnification theory. *Id.* at 333-34. The Third Circuit held that the accountants' indemnification claim against the debtor, which did not become actionable under state law until the accountants themselves were sued, was a post-petition claim even though the conduct upon which their liability was predicated (negligent preparation of the debtor's financial statements) occurred pre-petition. *Id.* at 337.

The *Frenville* decision and narrow "state law accrual theory" espoused by the Third Circuit have been sharply criticized and widely rejected by other courts as contrary

7

to the plain language of section 101(5) and congressional intent to include contingent claims not yet actionable under state law within the broad definition of "claims" in bankruptcy. *See, e.g., California Dep't of Health Servs. v. Jensen (In re Jensen)*, 995 F.2d 925, 930 (9th Cir. 1993) ("*Frenville*'s 'right to payment' theory is 'widely criticized' outside the Third Circuit, at least in part because it would appear to excise 'contingent' and 'unmatured' claims from § 101(5)(A)'s list.") (citation omitted); *Grady v. A.H. Robins Co. (In re A.H. Robins Co.)*, 839 F.2d 198, 201 (4th Cir. 1988) ("We have found no court outside the Third Circuit which has followed the reasoning and holding of *Frenville*."); *Watson v. Parker* (*In re Parker*), 264 B.R. 685, 696 (BAP 10th Cir. 2001) ("*Frenville* is the minority view and has been heavily criticized by courts."); *Piper Aircraft*, 162 B.R. at 624 ("The problem with the *Frenville* decision and its progeny is that exclusive reliance on the accrual of a state law cause of action ignores the intent of Congress to define claim broadly in bankruptcy cases."); *In re Amfesco Indus., Inc.*, 81 B.R. 777, 781-82 (Bankr. E.D.N.Y. 1988) (rejecting state law accrual theory and noting "[t]he *Frenville* decision would replace the federal definition of 'claim' as found in § 101(4) with the narrower state concept of 'cause of action'"); *Roach v. Edge (In re Edge)*, 60 B.R. 690, 704 (Bankr. M.D. Tenn. 1986) (noting "*Frenville* confuse[s] the existence of a present right of action or access to the courts with the existence of a 'claim' for bankruptcy purposes," and "*Frenville* has been criticized for failing to differentiate access to the courts and 'claim' in bankruptcy.") (citing cases).

Another theory that has developed is the "conduct test" under which a claim arises in bankruptcy when the underlying conduct occurs. The leading case in support of this theory is the Fourth Circuit's 1988 decision in *A.H. Robins*, where the court held that

8

a woman inserted with a Dalkon Shield intrauterine device pre-petition was a contingent claimant as of the petition date even though her injuries resulting from the defective IUD did not manifest until after the petition date. 839 F.2d at 203.  The conduct test was followed most notably by bankruptcy courts in the asbestos context holding that persons exposed to asbestos pre-petition held "claims" as of the petition date. *See In re Johns-Manville Corp.*, 57 B.R. 680, 692 (Bankr. S.D.N.Y. 1986); *In re Waterman S.S. Corp.* 141 B.R. 552 (Bankr. S.D.N.Y. 1992), *vacated on other grounds*, 157 B.R. 220 (S.D.N.Y. 1993).

## II.     Eleventh Circuit Court of Appeals has Adopted the "Pre-Petition Relationship" Test to Determine When a Claim Exists in Bankruptcy

In *Piper Aircraft*, the legal representative for future products liability claims filed a proof of claim on behalf of all future claimants in the approximate amount of $100 million.  The claim was based not upon known or identifiable liabilities, but rather upon certain statistical assumptions regarding the number of people likely to suffer post-confirmation personal injury or property damage caused by the debtor's pre-confirmation manufacture and distribution of aircraft.  In connection with the legal representative's motion to estimate this claim for chapter 11 plan voting purposes, he asked the court to determine, as a threshold matter, whether the future claimants held "claims" under section 101(5) entitled to treatment under the plan. 162 B.R. at 622.

After a thorough analysis of the legislative history, Judge Mark considered both the state law accrual theory adopted by the Third Circuit in *Frenville* and the conduct theory endorsed by the Fourth Circuit in *A.H. Robins*.  While decisively rejecting the narrow state law accrual theory as contrary to the clear language and legislative intent of

section 101(5),[3] Judge Mark examined the broad, mass tort type of "conduct test" urged by the future claims representative and found that, unlike in the asbestos and Dalkon Shield cases, the defective Piper aircraft and any future products liability claims resulting therefrom were not identifiable. *Id.* at 623-25.  Judge Mark reasoned, therefore, that "[i]n effect, under the Conduct Test, everyone in the world would hold a claim against Piper simply by virtue of their potential exposure to any plane in the existing fleet," and rejected "application of a Conduct Test that would give rise to 'claims' simply because the design and manufacture of products occurred prepetition." *Id*. at 625.

Instead, Judge Mark looked to a variation of the conduct test applied by courts which held that, in addition to pre-petition wrongful conduct, some sort of "prepetition relationship" with the debtor was necessary to give rise to a claim. *Id.* at 625-26 (discussing *In re Pettibone Corp.*, 90 B.R. 918 (Bankr. N.D. Ill. 1988), and *In re Chateaugay Corp.*, 944 F.2d 997 (2nd Cir. 1991)).  Judge Mark held that a claim cannot exist in bankruptcy absent some pre-petition relationship between the claimant and the debtor, and that the definition of "claim" cannot be stretched to include unidentified and unidentifiable tort victims "whose rights depend entirely on the fortuity of future occurrences and not on any prepetition relationship to the Debtor." 162 B.R. at 629.  Comparing the pre-petition relationship test to the conduct test, Judge Mark found:

> The Conduct Test and the Relationship Test are not mutually exclusive theories.  Requiring that there be some prepetition relationship between the Debtor and claimant would not change the analysis or results of the Conduct Test cases.  In fact, such a

---

[3] "The problem with *Frenville* and its progeny is that exclusive reliance on the accrual of a state law cause of action ignores the intent of Congress to define claim broadly in bankruptcy cases. . . .  Defining the right to payment under § 101(5) by tying it to state law is inappropriate and the Court thus rejects the accrued state law claim theory." *Id.* at 624.

10

> requirement appears to be implicit in those decisions. In the asbestos cases, the future claimants were individuals who were known to have had prepetition exposure to the dangerous product. Likewise, in *A.H. Robins*, the court determined that the claim arose when the claimant was inserted with a Dalkon Shield. And in *Edge*, the court noted that the Bankruptcy Code recognizes a claim for the victim of prepetition misconduct "at the earliest point in the relationship between victim and wrongdoer." Thus, the Conduct Test cases presume not only that there was prepetition conduct, but also that there was some prepetition relationship between the debtor's conduct and the claimant.

*Id*. at 627 (citations omitted). In disallowing the claim filed by the future claims representative, Judge Mark concluded that:

> **The definition of "claim" in the Bankruptcy Code is intentionally broad and sweeps within its scope remote and contingent obligations not necessarily actionable under state law at the commencement of a bankruptcy case**. Still, the definition must and does have limits. Based upon the nature of Piper's prepetition conduct and the absence of any relationship between the class and Piper's prepetition activities, Piper's Future Claimants do not have "claims" in this case.

*Id.* at 629 (emphasis added). Judge Mark's decision was affirmed on appeal by the district court (168 B.R. 434 (S.D. Fla. 1994)) and the Eleventh Circuit Court of Appeals, which memorialized Judge Mark's pre-petition relationship test as the law of the Eleventh Circuit. 58 F.3d 1573 (11th Cir. 1995).[4]

### III. Bankruptcy Courts Applying Pre-Petition Conduct or Relationship Test Hold that Tort Claims Arising from Pre-Petition Negligence are Pre-Petition Claims

Though the *Piper Aircraft* case did not call for a precise definition of the type of pre-petition relationship that would qualify a contingent or unmatured claim for treatment

---

[4] The Eleventh Circuit actually adopted a modified version of Judge Mark's pre-petition relationship test, called the "*Piper* test," which shifted the focus to whether a particular claimant had a pre-confirmation relationship with the debtor for purposes of identifying potential products liability claims that could be dealt with under a chapter 11 plan. 58 F.3d at 1577.

11

as a "claim" in bankruptcy (i.e., since the unknown future tort victims in that case had *no* pre-petition relationship with Piper), other courts have applied variations of the test outside the products liability context to tort claims arising from relationships more similar to the doctor-patient relationship that existed between Florencio Pernas and Pan American Hospital prior to the Petition Date.

For example, *Roach v. Edge (In re Edge)*, 60 B.R. at 690, a Tennessee bankruptcy court decision cited with approval by Judge Mark in *Piper Aircraft*,[5] involved a claimant who was a former patient of the debtor dentists. Approximately four months after the dentists' bankruptcy filing, the former patient discovered that certain dental treatment she received pre-petition may have been negligent. She sued the debtors in state court while asking the bankruptcy court for a declaration that her dental malpractice claim was a post-petition claim not subject to the automatic stay. The debtors contended that the claim arose pre-petition when the alleged negligence occurred. 60 B.R. at 691.

After analyzing the legislative history behind section 101(5), and emphasizing Congress's intent to remove the claim provability requirement that existed under the former Bankruptcy Act, Judge Keith Lundin concluded that "[t]he policies that guide interpretation of the Bankruptcy Code are served by the conclusion that **a claim arises at the time of the negligent act, notwithstanding that access to other courts or the running of a statute of limitation may be timed from some other point in the relationship between tortfeasor and victim**." *Id*. at 701 (emphasis added). Rejecting

---

[5] Though *Edge* was cited by Judge Mark as an example of the "conduct test," he found that application of the pre-petition relationship test in that case would not change the analysis or result because the dental malpractice victim had a pre-petition relationship with the debtors sufficient to give rise to a claim. *Piper Aircraft*, 162 B.R. at 627.

the state law accrual theory and ruling that the former patient's dental malpractice claim arose pre-petition, Judge Lundin reasoned:

> [The Third Circuit's decisions in] *Schweitzer* and *Frenville* confuse the existence of a present right of action or access to the courts with the existence of a "claim" for bankruptcy purposes. . . . *Frenville* has been criticized for failing to differentiate access to the courts and "claim" in bankruptcy.
>
>     ****
>
> More basically, this court disputes the proposition offered by the Third Circuit that "there is no legal relationship … between a tortfeaser and a tort victim until a tort actually has occurred." The sentence itself is a tautology. **There is contact and effect between tortfeasor and victim at the time of commission of the injurious act. The victim of negligence has an "interest" in the negligent party though judicial redress of the wrong must await the accrual of other facts**. This interest is "contingent" and "unmatured" but it is a significant personal right of the victim which may mature into a traditional action in court. In conclusion, a right to payment and thus a claim arose at the time of the debtors' prepetition misconduct.

*Id.* at 704-05 (emphasis added) (citations omitted).

  The same rationale applied by the *Edge* court has been followed by courts faced with other types of professional malpractice claims. *See Watson v. Parker* (*In re Parker*), 264 B.R. at 697-98 (holding legal malpractice claim against debtor attorney arising from pre-petition legal representation was pre-petition "claim" under section 101(5) even though it did not accrue under state law until after petition date: "[claimant] had a contingent claim against the Debtor at the moment the Debtor engaged in the conduct that formed the basis for malpractice liability."); *Wheeler v. Magdovitz (In re Wheeler)*, 137 F.3d 299, 300-01 (5th Cir. 1998) (holding that, under *Piper* test, debtor's legal malpractice claim arose pre-petition when negligent services were rendered, not post-petition when claim first accrued and became actionable under state law); *In re Tomaiolo*,

205 B.R. 10, 15 (Bankr. D. Mass. 1997) (debtor's malpractice claim in respect of pre-petition legal services arose pre-petition, and therefore was estate property, though claim did not accrue under state law until after petition date); *Ellwanger v. Budsberg (In re Ellwanger)*, 140 B.R. 891, 898 (Bankr. W.D. Wash. 1992) (same).

### IV. Maria Piniero's Wrongful Death Claim Arose from Pan American Hospital's Pre-Petition Negligence

Ms. Piniero asserts that because a wrongful death claim cannot exist until a death occurs, which in this case was post-petition, her claim must be a new post-petition claim. This argument, however, ignores both the plain language of section 101(5) and relies upon a legal theory – namely, the "state law accrual theory" – which was specifically rejected by the Eleventh Circuit Court of Appeals and nearly every other court that has decided this issue.[6] The alleged malpractice at issue here is the Hospital's alleged failure to timely intubate Mr. Pernas which resulted in anoxic brain injury and may have ultimately caused Mr. Pernas's coma and death. In the event that Mr. Pernas survived, however, he still may have held a claim against PAHC for medical malpractice or negligence due to his brain injury. The post-petition timing of his death and recharacterization of the resulting claim to a "wrongful death" claim, therefore, should not affect the Court's analysis under section 101(5) and decisional law construing that statute; whether the final event in this unfortunate factual sequence was Mr. Pernas's death, coma, or permanent brain injury is irrelevant to the Court's inquiry – *the alleged*

---

[6] As one bankruptcy court noted, "for federal bankruptcy purposes, a pre-petition claim **may encompass a cause of action that, under the state law, is not cognizable until after the petition is filed**." *In re The Highland Group, Inc.,* 136 B.R. 475, 481 (Bankr. N.D. Ohio 1992) (emphasis added).

14

*conduct that gives rise to whatever claim may be asserted on behalf of Mr. Pernas indisputably occurred pre-petition while he was a patient at Pan American Hospital.*

Ms. Piniero also argues that she, as personal representative of the decedent's estate, is a different claimant than the decedent and therefore should be deemed to hold a new claim which arose post-petition upon Mr. Pernas's death. The Court finds no merit in this argument either since, under the Florida Wrongful Death Act (Fla. Stats. §§ 768.16 – 768.26), a personal representative is the successor in interest to the decedent and has exclusive standing to bring a wrongful death claim on behalf of the decedent's estate, while the survivors and family members cannot individually bring such claim. *See* Fla. Stats. § 768.20 ("The [wrongful death] action shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, caused by the injury resulting in death.").

Even assuming for sake of argument that Ms. Piniero is considered a new claimant under state law, the chain of events or "relationship" that gave rise to her claim – which is the focus of *bankruptcy* law – unquestionably began with the Hospital's pre-petition negligent treatment of Florencio Pernas. The *Edge* decision is instructive on this point: "[T]he 1978 Bankruptcy Code recognizes a 'right of payment' for the victim of a debtor's prepetition misconduct **at the earliest point in the relationship between victim and wrongdoer**. Though this right to payment may not be manifested as a right of access to other courts and though it be unmatured and contingent, it is a charge upon the wrongdoer and a demand inherent in the victim from the moment of the wrongful act." 60 B.R. at 699 (emphasis added).

15

## CONCLUSION

If a patient was improperly treated pre-petition, and the patient either fully recovered or died pre-petition, then all claims would clearly be pre-petition claims. If a patient was improperly treated pre-petition but developed no symptoms until post-petition, as in the asbestos or Dalkon Shield cases, the case law seems to conclude the claim is a pre-petition one. So too, if a patient was improperly treated pre-petition, and experienced pain and suffering both pre-petition and post-petition, the patient would not have two claims, pre-petition and post-petition, but rather one pre-petition claim. The Court believes the case law relies on the parties' relationship and the act of causation in establishing the nature of a claim in bankruptcy. If both the relationship and act occur pre-petition, as they have in this case, then the claim is a pre-petition claim.

The doctor-patient relationship that existed between Pan American Hospital and Florencio Pernas prior to the Petition Date was sufficient to give rise to a "claim" against PAHC; Mr. Pernas was admitted to the Hospital on or about December 28, 2003, and the Hospital's alleged negligence that proximately caused Mr. Pernas's death occurred on the evening of December 31, 2003 – over three months before PAHC's bankruptcy filing. These material facts are not in dispute and in fact are alleged by the claimant herself; the settled law, therefore, compels this Court to determine that the Piniero Claim is a pre-petition claim in PAHC's bankruptcy case. For the foregoing reasons, it is

ORDERED AND ADJUDGED that the Motion for Reconsideration is DENIED. Claim No. 220 filed against PAHC by Maria Piniero, as personal representative of the estate of decedent Florencio Pernas (the "Piniero Claim"), is deemed a pre-petition general unsecured claim in PAHC's bankruptcy case and shall be treated as such under

16

any Chapter 11 plan confirmed for PAHC, without prejudice to the rights of PAHC or any other party in interest to object to or seek estimation of the amount of the Piniero Claim.

###

Copy to:

Frank P. Terzo, Esq.
Katz Barron Squitero Faust
2699 South Bayshore Drive
Seventh Floor
Miami, Florida 33133

[Attorney Terzo is directed to mail a conformed copy of this Order to all parties in interest and to file a Certificate of Service with the Court.]